**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE No. 14-62834-CIV-GOODMAN**

**[CONSENT CASE]**

JULIAN MARIE BRESLOW,

      Plaintiff,

vs.

AMERICAN SECURITY INSURANCE
COMPANY,

      Defendant,

vs.

BROWARD DOCK AND SEAWALL,
INC., et al.,

      Third-Party Defendants.

_____/

## ORDER ON PLAINTIFF'S WORK PRODUCT CLAIM

This discovery dispute is about supposed secrets.

More particularly, the parties are tussling over two emails which Plaintiff contends need not be disclosed because she says they are protected as work product material. Defendants, however, argue that the documents were never work product protected in the first place, but that any protection was waived, in any event.

For the Undersigned, the analysis used to resolve this dispute summons up lyrics from two songs.

In the order of how the issues are evaluated, the first song lyrics are from a Cyndi Lauper song: "Oh, it's fascination, with the anticipation."[1] And the second song lyrics are from The Beatles: *Listen, do you want to know a secret/ Do you promise not to tell, whoa oh, oh."*[2]

Combining the themes from these two songs helps inform the two legal issues underlying this discovery dispute: (1) whether an insured anticipated litigation when her counsel was trying to obtain payment on a claim submitted to the insurance carrier, and (2) whether the insured homeowner waived any work product production, if it existed in the first place, because her attorney wrote emails to a property management company who provided services to *all* subdivision homeowners, including the insured's next-door neighbor -- who allegedly caused some or all of the damage at issue.

Similar to the attitude displayed by Cyndi Lauper in her song, Plaintiff here seems to have a fondness for invoking the anticipation principle when determining whether documents deserve work product protection. The anticipation of litigation urged by Plaintiff here, however, is premature.

But even if the work product claim arose as early as Plaintiff contends (and it did not), the work product claim asserted by Plaintiff cannot prevail. The musical words of

---

[1]     From the song, "Grab a Hold", from the <u>Bring Ya to the Brink</u> album (Epic 2008).

[2]     From the song, "Do You Want to Know a Secret," released on the <u>Please Please Me</u> album (1963 EMI Studios/Parlophone).

The Beatles underscore that the fundamental notion of secrecy is to not tell others about undisclosed and confidential information. That's what makes it secret. A similar rule applies to work product material, where disclosing the purportedly protected information to a potential adversary (i.e., revealing to them the so-called private information) is inconsistent with the basic point of keeping a secret (and therefore usually generates a waiver of the work product protection).

In this lawsuit over alleged damage to residential property insured by Defendant American Security Insurance Company ("ASIC"), Plaintiff's counsel communicated by email to a property management company about the facts at issue in this lawsuit. The parties are now wrangling over the emails. Plaintiff Julian Marie Breslow contends that the emails need not be disclosed to ASIC in response to discovery requests because they are protected work product material. ASIC disagrees, saying the emails are not work product in the first place because litigation was not anticipated when they were sent, but, even if litigation was anticipated at that comparatively early point, Breslow waived the protection when her attorney sent information to a third party who also provides services to a potential adversary.

The Undersigned has reviewed the filed-under-seal emails *in camera* and has also reviewed memoranda submitted by Breslow and ASIC [ECF Nos. 107; 108].

The Undersigned finds that ASIC is correct on both points, and directs Breslow to produce the emails to ASIC within five days of this Order. In addition, because

Plaintiff is the losing party in this discovery dispute and because Federal Rule of Civil Procedure 37(a)(5) requires a fee-shifting award to the prevailing party in the absence of limited exceptions inapplicable here, Plaintiff's counsel are being required to pay ASIC $1,000.

The facts and legal analysis are outlined below:

**Factual Background**

According to Breslow's First Amended Complaint [ECF No. 37], ASIC issued a property insurance policy which insured against certain losses to her Fort Lauderdale waterfront property. She alleges that her property was damaged on March 27, 2014 as a result of a construction/remodeling/renovation project being done on the adjacent property. Breslow also alleges that ASIC issued a payment to her on June 26, 2014 for an amount she deems insufficient. She alleges breach of the insurance policy contract.

In its answer [ECF No. 47], ASIC contends, as an affirmative defense, that it satisfied its obligations under the insurance policy by making the June 26, 2014 payment of $6,628. It raises several other affirmative defenses, including the argument that the alleged losses occurred on property not covered by the policy (such as an outdoor swimming pool, piers, wharves, docks, retaining walls and piling below the water mark), that Breslow failed to mitigate her damages and that Breslow's neighbors (the "Nelsons") retained Broward Dock and Seawall ("Broward Dock") to perform construction work which caused the damages on Breslow's property.

Based on this affirmative defense, ASIC filed a third party complaint [ECF No. 42] against Broward Dock and the Nelsons. It explained that Broward Dock was performing the following work at the Nelsons' home, which is next door to Breslow's property: repairing the seawall, replacing the dock and raising the pool deck and steps. The third party complaint noted that Breslow is seeking more than $600,000 in damages in connection with the damage allegedly caused by Broward Dock's work for the Nelsons. It also alleged that Breslow notified ASIC of its claim on March 27, 2014.

During discovery, Breslow served a notice of intent to serve a *duces tecum* subpoena on Vordermeir Management Company ("VMC"), the property management company which manages the planned unit development where both Breslow and the Nelsons have their property. Breslow asserted a work product claim over two emails dated May 20, 2014 from Breslow's counsel to VMC, and the parties battled over this during a discovery hearing. During the hearing, in response to a question, Breslow's counsel admitted that VMC is not one of her agents.

During that discovery hearing, the Undersigned required Breslow to file the two emails under seal, directed her to file a memorandum of law and permitted ASIC, Broward Dock and the Nelsons to file an optional response memorandum. The Undersigned later memorialized this ruling in a post-hearing administrative order [ECF No. 102]. The Order required Breslow's memorandum to address the issues of "whether

the documents are, in fact, work product, and, if so, whether there was a waiver of the work product privilege."

Breslow's privilege log describes the two May 20, 2014 emails to VMC as work product. One is described as "E-mail re: construction activity at 71 Compass Lane [i.e., the Nelsons' property] in anticipation of litigation," and the other is described as "E-mail re: Request for Association documents, in anticipation of litigation."

Neither email contains any type of actual warning or a description consistent with the current privilege claim, such as "work product" or "sensitive and confidential" or "do not disclose" or "common interest material" or "in anticipation of litigation."

In a December 17, 2015 email [ECF No. 108-2] leading up to the discovery hearing, Breslow's counsel asserted work product protection to the two emails because "our client and/or her attorneys were investigating certain issues related to the problems that our client was experiencing as a result of the neighbor's construction activities, et cetera, which included, but were not limited to, requesting information in anticipation of litigation."

Because timing of events is often critical when determining when litigation was reasonably anticipated for purposes of pinpointing the start of work product materials, the Undersigned notes that ASIC's April 22, 2014 letter to Breslow provides a status report of her claim. It noted that its investigation was "pending review of engineer's report relative to his inspection of your residence as we requested." [ECF No. 108-3, p.

6]. It also explained that the claim "remains open pending receipt of this information." And ASIC also said "we hope to conclude this matter within 30 days."

Likewise, in another April 22, 2014 letter, ASIC advised Breslow that a tile inspection report and repair estimate for the second floor balcony was requested and that the inspection would be scheduled through Breslow's counsel. [ECF No. 108-3, p. 14].

On April 28, 2014, Breslow's counsel wrote to ASIC, attaching a letter of representation and a request for documents concerning the claim. [ECF No. 108-3, p. 7-9]. The letter instructs ASIC to no longer directly contact Breslow and directed ASIC to make all payments to the law firm. The letter asked ASIC for documents in several categories (including reports and estimates from experts, engineers, and adjustors) and asked that any items being withheld on privilege grounds be identified, along with an explanation of which privilege was being asserted. The letter ended with this sentence: "I look forward to **discussing** at your earliest convenience our respective evaluations of this matter and all of the facts and circumstances surrounding this claim." (emphasis added).

In a May 2, 2014 response [ECF No. 108-3, pp. 11-12] to the letter from Breslow's counsel, ASIC (in a letter from a field staff adjuster) urged counsel to "be assured" that it "is interested in resolving this claim as quickly and fairly as possible." Nevertheless, it reminded counsel that Breslow still had obligations under the insurance policy contract,

notwithstanding the involvement of counsel. ASIC further advised that it did not object if counsel were to attend inspections of the property. It also explained that it would consider any estimates that counsel submitted. It likewise advised that it did not object to Breslow hiring an adjuster, contractor or construction specialist, at her expense. The letter urged counsel to contact him by phone or mail if he had questions about the claim, did not understand how the claim has been settled or had additional information for review by ASIC.

ASIC gave notice of its position in a June 26, 2014 letter [ECF No. 108-3, pp. 15-17]. The letter provided an explanation for the $6,682 net amount of the claim.

After that, the next written communication provided to the Court is a July 9, 2014 email from Breslow's counsel to the ASIC field adjuster [ECF No. 108-3, pp. 21-23].  This letter notes significant disagreement with ASIC's final adjustment and it advances several arguments. It asks the adjuster to clarify ASIC's position, notes that Breslow was in the process of obtaining an independent evaluation of the damages and asks ASIC to "**reconsider** its coverage determination." (emphasis supplied).

More than two months later, in a September 19, 2014 email, Breslow's counsel wrote again to ASIC's adjuster and noted his disagreement over the carrier's assessment of both the scope and amount of loss. He attached an independently prepared estimate of damages of almost $400,000. It said: "If ASIC desires to discuss a potential resolution of this matter **without the necessity of litigation**, then this rather large claim merits

8

further consideration, and, to that end, I ask that you contact me once you've had an opportunity to review the attached, so that we may **discuss** ASIC's reconsideration of its adjustment of the damages to covered property sustained in connection with the construction vibrations and plumbing break that are the subject of this claim." [ECF No. 108-3, p. 20] (emphasis added).

This is the first document submitted to the Court in which litigation is mentioned.

In an October 10, 2014 letter to Breslow's counsel [ECF No. 108-3, pp. 18-19], ASIC's adjuster explained in detail the basis for the coverage decision and how the claim was adjusted.  The letter referenced "several phone conversations" in which ASIC advised that an appraisal could be requested "if we are in agreement with scope of repairs." It ended with a request that counsel advise "as to the direction you are taking relative to this claim."

Breslow filed her lawsuit against ASIC in state court. The Complaint is dated October 23, 2014, but service was not perfected until November 14, 2014. [ECF No. 1]. ASIC removed the case to this Court on December 12, 2014.

**The Parties' Positions**

<em>Breslow's Position</em>

Breslow's memorandum contends that the first email (sent at 5:55 p.m.) is protected under the *opinion* type of work product immunity because it was prepared by

counsel in anticipation of litigation and reflects his mental impressions, conclusions, opinions or legal theories "concerning the (anticipated) litigation." It also contends that this email was prepared "in response to the **non-adversarial** Property Manager's request to speak with him concerning an inspection of the Plaintiff's damaged seawall as a result of the construction activities conducted by the Plaintiff's neighbor/Third-party Defendants, the Nelsons." (emphasis in original memorandum).

Breslow further argues that the second email (sent at 6:26 p.m.) is protected under the *fact* type of work product immunity because it, too, was prepared by counsel in "anticipation of litigation as part of his compilation of materials in preparation of his client's case." She also takes the position that Defendant/Third Party Defendants cannot make the requisite showing that they have a substantial need for the information because they can obtain the substantial equivalent through other discovery methods.

Breslow contends that the disclosures in the emails cannot waive work product protection because the recipient (VCM) is a non-party to the lawsuit and there is no adversarial relationship between Plaintiff and VCM. Breslow argues that this non-adversarial relationship demonstrates that her counsel did not know that the emails would substantially increase the likelihood that an opposing party would obtain the purportedly protected information.

Finally, Breslow contends that the emails are protected under the common interest exception to waiver because she "shares a common legal interest with the Bay

Colony Homeowners' Association (vis-a-vis the Property Manager) in that both parties have an interest in the condition of the Bay Colony community." Recognizing that the Nelsons are also members of this Association, Breslow argues that the Nelsons are adversaries to her common interest -- and are also adverse to the common interests of all other Bay Colony homeowners.

<u>ASIC and the Nelsons' Position</u>[3]

Initially, ASIC and the Nelsons contend that Breslow has not met her burden of establishing the applicability of the work product doctrine to the two emails.  They note that the two emails were sent only two months after the loss was reported and more than one month before ASIC issued its coverage decision. Therefore, they say Breslow has not demonstrated that the primary motivating purpose of the emails was the anticipation of litigation.

In connection with this argument, they note that nothing other than counsel's rhetoric supports the notion that the two emails were prepared in response to VMC's request for information.

Moreover, they raise a related point: even if the primary purpose was to respond to VMC's request for information, this does not demonstrate an anticipation of litigation. Instead, it merely shows the primary purpose was to gather information in response to a request.

---

[3]     ASIC and the Nelsons jointly filed a response memorandum. Broward Dock did not join them in the opposition brief.

ASIC and the Nelsons next note that VMC is not Breslow's agent (or the agent of her attorney) and then argue that the work product protection does not protect communications with independent third parties.

They then contend that any work product protection was waived because VMC was under no duty to maintain the confidentiality of the documents or information in them and therefore could have disclosed the emails to anyone at any time -- including to the Nelsons, who are potential adversaries. They stress that Breslow did not provide any evidence to suggest that she or her counsel had a reasonable expectation of secrecy with VMC.

Finally, ASIC and the Nelsons challenge Breslow's common interest argument, noting that such a theory is "completely speculative" and emphasizing her failure to provide any evidence from VMC to confirm the existence of a common interest.

## Applicable Legal Principles and Analysis

### *Work Product*

Before evaluating whether the two emails are immune from discovery under the work product doctrine, the Undersigned will outline the relevant legal guidelines:

Florida law governs the attorney-client privilege in a federal diversity of citizenship case while federal law governs work product assertions in diversity actions. *Bradt v. Smith*, 634 F.2d 796, 800 (5th Cir. 1981); *Milinazzo v. State Farm Ins. Co.*, 247 F.R.D. 691, 698-701 (S.D. Fla. 2007); *1550 Brickell Assocs. v. Q.B.E. Ins. Co.*, 253 F.R.D. 697

(S.D. Fla. 2008); *Atrium on the Ocean v. QBE Ins. Corp.*, Case No. 06-14326, 2007 WL 2972937 (S.D. Fla. Oct. 9, 2007). *See also Frontier Refining, Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 702 n. 10 (10th Cir. 1998) ("[u]nlike the attorney client privilege, the work product privilege is governed, even in diversity cases, by a uniform federal standard embodied in Fed. R. Civ. Pr. 26(b)(3)"); *Commercial Long Trading Corp. v. Scottsdale Ins. Co.*, No. 12-22787, 2012 WL 6850675 (S.D. Fla. Dec. 26, 2012). *See generally* E. Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine*, at 122 (4th Ed. Supp.), ("[b]ecause work-product protections are predicated on Federal Rule of Civil Procedure 26(b)(3), federal law applies even in diversity cases, even though the law of the state in which the forum sits is applied to attorney-client privilege issues").

Second, the party claiming work product immunity has the burden to establish the claimed protection. *S. Bell Te. & Tel. Co. v. Deason*, 632 So. 2d 1377 (Fla. 1994) (attorney-client); *Milinazzo*, 247 F.R.D. at 698 (work product).

Third, a party must anticipate litigation **at the time the documents were created** for the protection to apply. *Milinazzo,* 247 F.R.D. at 698.

Fourth, the Court must determine when the document was created and why it was created. *Id.*

Fifth, applying work product in the context of insurance claim files in a direct breach of contract action is somewhat "complex" because "it is in the ordinary course of business for an insurance company to investigate a claim with an eye toward litigation."

*Id.* at 701. Recognizing this practical reality, many courts, including several in the Southern District of Florida, establish a rebuttable presumption that documents or things prepared before an insurer's final decision on a claim are not work product but that documents and things produced *after* a claim's denial are work product. *See id.; 1550 Brickell Assocs.*, 253 F.R.D. at 698-699. *See also Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 662 (S.D. Ind. 1991); *Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*, 268 F.R.D. 695, 698 (S.D. Fla. 2010). *See also Sun Capital Partners, Inc. v. Twin City Fire Ins. Co.*, No. 12-81397, 2015 WL 1860826 (S.D. Fla. Apr. 22, 2015).

Sixth, a party involved in a dispute with an insurance carrier may rebut the presumption that documents prepared before the carrier's final decision are not work product by "specific evidentiary proof of objecting facts." *Milinazzo*, 247 F.R.D. at 701; *Sun Capital Partners*, 2015 WL 1860826, at *4; *Essex Builders Grp., Inc. v. Amerisure Ins. Co.*, Case No. 6:04-cv-1838, 2006 WL 1733857 (M.D. Fla. June 20, 2006).

Seventh, in determining whether the presumption has been rebutted, the Court may consider the length of time between the alleged date of anticipated litigation and the date suit was actually filed, whether the parties were working towards a resolution and whether there was a clear intention to sue made by one of the parties. *Sun Capital Partners*, 2015 WL 1860826 at *4; *1550 Brickell Assocs.*, 253 F.R.D. at 699-70.

Eighth, the burden to demonstrate that a privilege applies is "not, of course, discharged by mere conclusory or *ipse dixit* assertions, for any such rule would foreclose

14

meaningful inquiry into the existence of the relationship, and any spurious claims could never be exposed." *Bridgewater v. Carnival Corp.*, Case No. 10-CV-22241, 2011 WL 4383312 (S.D. Fla. Sept. 20, 2011) (internal citation omitted).

Ninth, an improperly asserted claim of privilege is no claim of privilege at all. *Bridgewater*, 2011 WL 4383312, at *1.

Tenth, the party claiming a privilege must provide the court with underlying facts demonstrating the existence of the privilege, which may be accomplished by affidavit. *Bridgewater*, 2011 WL 4383312, at *1.

The two emails in question were written on May 20, 2014, when Breslow's counsel was trying to negotiate a resolution of the damages claim with the carrier. The carrier gave notice of its coverage decision on June 26, 2014, more than a month later. Based on the communications provided to the Court, there was never any mention of litigation before May 20, 2014. In fact, Breslow's counsel continued to negotiate with the carrier after its June 26, 2014 coverage decision by repeatedly asking it to reconsider its decision for several months.

The September 19, 2014 letter is the first one in which Breslow mentions litigation. Even then, the letter did not actually and overtly threaten litigation; it merely noted that the carrier should contact counsel if it wanted to explore further discussions and reconsideration without litigation.

The primary purpose of the two emails is to summarize the status of Breslow's claim, to discuss the facts with the property management company and to request help in connection with problems arising at the Nelsons' construction site. Not only is litigation not mentioned, but the emails mention that Breslow's counsel was helping Breslow in her efforts to obtain payment from ASIC so that she could start the major repairs. In other words, the underlying theme was of *resolution*, not litigation. *See 1550 Brickell Assocs.*, 253 F.R.D. at 699 (describing *Milinazzo* as case involving "an ongoing discussion").

To be sure, an earlier April 28, 2014 letter from Breslow's counsel advised the carrier to communicate directly with him (and not to his client), but this is hardly a basis upon which to conclude that litigation would be forthcoming. In fact, district courts in Florida have rejected work product claims based on events significantly more hostile than a directive to communicate directly with counsel. *See e.g., Milinazzo*, 247 F.R.D. 691 (letter from insured's counsel requesting liability coverage information and expressly threatening a lawsuit if not contacted within thirty days did not create an anticipation of litigation); *Royal Bahamian*, 268 F.R.D. 695 (adjuster's report noting that at least one member of a litigation committee recommended suing was insufficient to establish a reasonable anticipation of litigation).

So nothing occurred by late May 2014 to support Breslow's contention that she anticipated litigation with ASIC when the emails were sent.

16

But Breslow argues (albeit cryptically and without explanation or detail) that she *also* anticipated litigation against the "Third Party Defendants" --  the Nelsons and Broward Dock. But she has come nowhere close to establishing anticipation of litigation with these parties as of May 2014.

First, Breslow has never filed a claim against either Broward Dock or the Nelsons; the only claim here was filed by ASIC. Second, ASIC's Third Party claims against Broward Dock and the Nelsons were filed in July 2015, long after the two emails were sent in May 2014. Third, although the first email describes problems with the Nelson's contractor and its employees, it does not threaten litigation against them. Fourth, the first email mentions that counsel will be "addressing these issues" with the Nelsons after receipt of estimates and proposals -- a planned strategy to pursue negotiation and compromise, not litigation. *See Guar. Ins. Co. v. Herrernan Ins. Brokers, Inc.*, No. 13-23881, 2014 U.S. Dist. LEXIS 146843, at *9-10 (S.D. Fla. Oct. 15, 2014) (overruling work product claim over emails whose primary motivating purpose was the review of information, the response to inquiries and the investigation of factual issues).

Breslow has not established that she anticipated litigation with ASIC, Broward Dock or the Nelsons as of May 20, 2014.

<u>*Disclosure to Third Parties*</u>

Assuming for the sake of discussion that Breslow and her counsel anticipated litigation on May 20, 2014 (which they did not), the next issue is whether the hypothetically assumed work product protection was waived because her counsel disclosed information to the property management company, a third party who was not Plaintiff's agent. Breslow argues that no waiver occurred because the property management company is not an adversary.

Although the rules governing waiver of attorney-client privileged information are different than those applicable to the work product doctrine, these differences are inadequate to avoid a waiver.

In the context of work product, the question is not, as in the case of the attorney-client privilege, *whether* confidential communications are disclosed, but *to whom* the disclosure is made -- because the protection is designed to protect an attorney's mental processes from discovery by *adverse* parties. *See generally Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 775 (D.C. Cir. 1978).

Work-product protection is waived when protected materials are disclosed in a way that "substantially increases the opportunity for potential **adversaries** to obtain the information." *Niagara Mohawk Power Corp. v. Stone & Webster Eng. Corp.*, 125 F.R.D. 578, 587 (N.D.N.Y. 1989) (emphasis added) (quoting *In re Grand Jury Subpoenas Dated Dec. 18, 1981 and Jan. 4, 1982*, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982)); 8 Charles Alan Wright,

Arthur R. Miller and Richard L. Marcus, *Federal Practice and Procedure*, § 2024 at 209–10 (1970).

As noted in *United States v. Gulf Oil Corp.*, 760 F.2d 292, 295 (Temp. Emer. Ct. App. 1985),[4] "[t]he purpose of the work product doctrine is to protect information against **opposing parties**, rather than against all others outside a particular confidential relationship, in order to encourage effective trial preparation[.] A disclosure made in the pursuit of such trial preparation, and not inconsistent with maintaining secrecy against **opponents,** should be allowed without waiver of the privilege." 760 F.2d 292, 295 (citations omitted) (emphasis added).

Thus, not *every* situation in which work-product materials are disclosed warrants a finding of waiver. Rather, the "*circumstances* surrounding the disclosure are key to determining whether an actual waiver of the work-product protection has occurred." *Stern*, 253 F.R.D. at 681 (emphasis added).

Generally speaking, as noted above, work-product protection is waived when protected materials are "disclosed in a manner which is either inconsistent with maintaining secrecy against **opponents** or substantially increases the opportunity for a potential **adversary** to obtain the protected information." *Niagara*, 125 F.R.D. at 590 (citing *Gulf Oil,* 760 F.2d at 295 and other cases) (emphasis supplied); *Kallas v. Carnival Corp.,* No. 06-20115-CIV, 2008 WL 2222152, at *4 (S.D. Fla. May 27, 2008) (a party waives

---

[4]      Citing *United States v. American Tel. & Tel. Co.*, 642 F.2d 1285 (D.C. Cir. 1980).

otherwise-protected work-product materials "when the covered materials are used in a manner that is inconsistent with the protection") (internal quotations omitted); *see also Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, No. 93 CIV. 5298 LMM RLE, 1996 WL 944011, at *3 (S.D.N.Y. Dec. 19, 1996) ("Work product immunity is waived only if the party has voluntarily disclosed the work product in such a manner that it is likely to be revealed to his **adversary**.") (emphasis supplied); *Falise v. Am. Tobacco Co.*, 193 F.R.D. 73, 79 (E.D.N.Y. 2000) (waiver of work-product protection found only if disclosure substantially increases the opportunity for potential **adversaries** to obtain the information) (emphasis added); *Stern v. O'Quinn*, 253 F.R.D. 663, 676 (S.D. Fla. 2008) (work-product waiver when disclosure occurs in a way which "substantially increases the opportunities for potential adversaries to obtain the information").

Thus, the first factor to focus on is whether Breslow had any rational reason to believe that the property management company would not disclose the information to the Nelsons, who are also homeowners in the same association which retained the property manager. There is nothing in the emails or the arguments asserted in Breslow's memorandum which convinces me that Breslow's counsel had an expectation that his emails would not be shown to the Nelsons or discussed with them. There is nothing submitted to suggest that VMC's relationship with Breslow was somehow better than its relationship with any other homeowner, such as the Nelsons.

In addition, the second factor -- the purpose of the disclosure (i.e., to help Breslow herself or to assist the community association or the property management company it retained) -- militates against Breslow's position. There is nothing to establish that Breslow's counsel was seeking to assist the association, rather than his own client. In fact, his second email includes a request that the management company forward material to *him.*

## *Common Interest Privilege*

In a final effort to avoid the production of these two emails, Breslow argues that she has a "common interest" with VMC, the property manager. But this is merely attorney rhetoric. There is no affidavit from Breslow's counsel, nor is there any supporting affidavit or other supporting information from VMC itself.

Under the "common interest" exception to waiver, a party may share its work product with another party without waiving the right to assert the privilege when the parties have a shared interest in actual or potential litigation against a common adversary, and the nature of their common interest is **legal,** and not solely commercial. *See Net2Phone, Inc. v. eBay, Inc.,* No. 06-2469, 2008 U.S. Dist. LEXIS 50451, at *23 (D.N.J. June 25, 2008) (citing *Thompson v. Glenmede Trust Co.,* Civ. No. 92-5233, 1995 U.S. Dist. LEXIS 18780, at *15 (E.D. Pa. Dec. 18, 1995); *Duplan Corp. v. Deering Milliken, Inc.,* 397 F. Supp. 1146, 1172 (D.S.C. 1974)); *see also Weber v. FujiFilm Med. Sys. U.S.A.,* No. 3:10cv401, 2011 U.S. Dist. LEXIS 6199, at *5 (D. Conn. Jan. 21, 2011); *Gulf Islands Leasing, Inc. v.*

*Bombardier Capital, Inc.*, 215 F.R.D. 466, 474 (S.D.N.Y. 2003); *Medinol v. Boston Sci. Corp.*, 214 F.R.D. 113, 115 (S.D.N.Y. 2002). Courts differ on the degree of commonality required to satisfy the common interest exception. *Compare Hoffmann La Roche, Inc. v. Roxane Labs., Inc.*, No. 09-6335, 2011 U.S. Dist. LEXIS 50404, at *15 (D.N.J. May 11, 2011) (substantially similar legal interests sufficient) *with Duplan*, 397 F. Supp. at 1172 (identical interests required).

Breslow contends that she shares a common legal interest with the homeowner's association because they both "have an interest in the condition of the Bay Colony community." But this interest, vague as it may be, is a commercial/business purpose, not a legal common interest. Breslow also argues that she and the association share a common interest because the Nelsons are a "common adversary." Although the Undersigned appreciates the creativity in crafting this theory, I am not convinced in its legal soundness. The theory was never raised before the memorandum was submitted. Moreover, any shared purpose in May 2014 was commercial, not legal.

In addition, Breslow has not submitted any evidence to demonstrate that *VMC* was even aware of this purported common interest when it received these two emails, and the Undersigned was not presented with any information to support the notion that VMC was siding with one homeowner against another and therefore had a common interest against a so-called adversary homeowner.

22

To be sure, there may well be instances where a homeowner's association is indeed in an adversarial relationship with a specific homeowner, such as when a homeowner fails to pay fees and the association imposes a lien on the homeowner's property. But that scenario is not present here. And although VMC may now (in February 2016) be adversarial with the Nelsons (and this is pure speculation, as the parties have not submitted any evidence on this), the record does not reveal that they were in fact adversarial in May 2014.

But even if Breslow was in an adversarial relationship with the Nelsons in May 2014, that does not automatically mean that the common interest doctrine applies to communications between her and a property management company retained by all homeowners. Breslow did not establish that VMC was even aware of this claimed common interest scenario and it is not illogical to view the claim as an after-the-fact justification which was never established, let alone even discussed, at the time.

Thus, Breslow has not established that she had a common interest privilege with VMC in May 2014 so that her attorney could safely send work product information to it without generating a work product waiver.

**<u>Attorney's Fees</u>**

As the party losing this discovery dispute, Breslow (and/or her counsel) is responsible for attorney's fees under Federal Rule of Civil Procedure 37, unless one or more of a limited list of exceptions apply. Rule 37 establishes a "loser pays" scenario,

and **requires** the Court to enter a costs award, including attorney's fees, unless an exception applies.  No exception applies here.

Federal Rule 37(a)(5)(A) provides that the Court "must" require the losing party or attorney or both to pay the costs/fees award, in the absence of an exception. Moreover, the Discovery Procedures Order [ECF No. 87, pp. 11] specifically cautions parties about the rule and its requirement that fees be awarded unless an exception applies.

The Undersigned does not believe that Plaintiff, herself, should pay the award, as it appears it was her counsel who persisted in urging the unsuccessful work product claim. In fact, Breslow may not have even be aware that a discovery dispute over the emails was unfolding, as she voluntarily surrendered to the federal Bureau of Prisons on September 26, 2015 to begin serving a 30-month sentence after pleading guilty to making false statements to the federal government and aiding and abetting. *United States v. Breslow*, Case No. 14-cr-00008-d-1, ECF Nos. 48; 76,[5] (E.D.N.C.). Therefore, it is Plaintiff's counsel[6] who will pay the fees award -- of **$1,000.00** -- within 10 days of this Order.[7]

---

[5]     The underlying criminal judgment and return, showing that Breslow surrendered. She is currently serving her sentence at FPC Alderson in Alderson, West Virginia.

[6]     The Undersigned does not consider a Rule 37(a)(5)(A) expense-shifting award to be a sanction, or the imposition of discipline, or an indication that anyone acted in bad faith. Rather, it is merely a **consequence** of taking certain unjustified positions in

If any party (or counsel of record) objects to either the fees award or the amount of the award, then the Court will hold a hearing if an objection is filed within seven days of this Order. If the challenge is to the amount, then counsel for both sides will be required to submit their billing records for the time in question.[8]

---

discovery. Thus, this Order would not require Plaintiff's counsel to answer "yes" if ever asked (e.g., by a prospective employer, by an insurance carrier, by a judicial nominating commission, by a client, or by a prospective client) if he or she had ever been sanctioned or disciplined.

[7]     Plaintiff's counsel shall submit an affidavit or declaration, confirming that the payment was made, to the Undersigned's efile inbox (*not* on CM/ECF) within three days of making the payment. Plaintiff's counsel shall not, directly or indirectly, pass on to the client this fees award as a costs item or deductible expense. The declaration shall also explain which attorney is being held responsible for the payment, and the amount of the responsibility.

[8]     The Undersigned may use his own experience in assessing the reasonableness of attorney's fees and may form an independent judgment either with or without witnesses. *Loranger v. Stierheim*, 10 F.3d 776, 781 (11th Cir. 1994); *see also Crescenzo v. Healthcare Revenue Recovery Grp., LLC*, No. 11-60384-CIV, 2012 WL 291431, at *2 (S.D. Fla. Jan. 31, 2012).

A court is "itself an expert on the question [of determining reasonable hourly rates] and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." *Norman v. Housing Auth.*, 836 F.2d 1292, 1303  (11th Cir. 1988).

The Court's $1,000 fees award is based on my 33 years of practice in the South Florida legal community, my involvement in issuing rulings on attorney's fees motions since July 2010 and my familiarity with the issues and attorneys involved in this case. As noted, either side may obtain a hearing on the amount of the award, which is based on a $300-per-hour rate.

**Conclusion**

Breslow has not established her work product claim for the two emails in questions and must therefore produce them to ASIC within 5 days and her counsel must pay the $1,000 fees award within 10 days.[9]

**DONE and ORDERED**, in Chambers, in Miami, Florida, February 19, 2016.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
All counsel of record

---

[9] Breslow (i.e., her counsel) would not have obtained a different outcome even if they followed the musical advice offered by the Yardbirds in their song "I'm Not Talking", released in 1965 on the For Your Love album (Epic): "I'm not talking / Well that's all I got to say." That's because the emails were not prepared in anticipation of litigation, a threshold issue which renders the later discussion about disclosure unnecessary (unless the ruling on when the work product privilege begins in this case is deemed incorrect).